**TSG WATER RESOURCES, INC. et al, Plaintiffs,**

v.

**D'ALBA & DONOVAN CERTIFIED PUBLIC ACCOUNTANTS, P.C. et al. Defendants.**

No. CV 402–258.

United States District Court, S.D. Georgia, Savannah Division.

May 10, 2004.

Inman Gregory Hodges, Oliver, Maner & Gray, LLP, Savannah, GA, Brent J. Savage, C. Dorian Britt, Savage & Turner, PC, Savannah, GA, for TSG Water Resources, Inc., (TSG), TSG Technologies, Inc., Donald L Mayer, Paul S. Steward, Jonathan D. Sprague, Robert M. Bolz, John A. Bolz, William Roger Holden, OGM Family Limited Partnership, plaintiffs.

John Colquitt Rogers, Johannes S. Kingma, Carlock, Copeland, Semler & Stair, LLP, Atlanta, GA, Thomas A. Withers, Gillen, Cromwell, Parker & Withers, LLC, Savannah, GA, Charles C. Ritter, Jr., Duke, Holzman, Yaeger & Photiadis, LLP, Buffalo, NY, for D'Alba & Donovan Certified Public Accountants, P.C., Morris Bencini, defendants.

## *ORDER*

NANGLE, District Judge.

In this diversity case, Plaintiffs are suing Morris Bencini ("Bencini") and D'Alba & Donovan Certified Public Accountants, P.C. ("D & D") on numerous claims arising from an audit of the TSG corporations for the year 2000. Plaintiffs have asserted claims of fraud and securities fraud against both Bencini and D & D (Count V), claims of breach of fiduciary duty against both Bencini and D & D (Counts II & III), claims for negligence against D & D (Counts I & IV), claims of breach of contract and negligent retention and supervision against D & D (Counts VI & VII), and claims for punitive damages and attorneys' fees against both Bencini and D & D (Counts VIII & IX).

Plaintiffs can be placed into three groups. The first group includes TSG Water Resources, Inc. and its wholly-owned subsidiary, TSG Technologies, Inc. (collectively, "TSG"). Defendant Bencini is a former vice-president and chief financial officer ("CFO") of TSG and held those

positions from around July 1999 until June 2001. The second group of plaintiffs ("Inside Investors") consists of Donald Mayer,[1] Paul Steward,[2] and Jonathan Sprague.[3] These individuals were all Directors of TSG during the time at issue in this suit and are all currently Directors. The third group ("Outside Investors") consists of Robert Bolz,[4] John Bolz,[5] William Holden,[6] and OGM Family Limited Partnership ("OGM").[7] These investors were friends and family members of Mayer.

Before the Court are Defendant Bencini's Motion for Summary Judgment (Doc. 93), Defendant D & D's Motion for Summary Judgment (Doc. 71), and Defendant Bencini's Motion for Advance of Legal Fees and Expenses (Doc. 66). Also before the Court are Plaintiffs' Motion for Oral Argument (Doc. 118) and Motion for Reconsideration (Doc. 124).

## BACKGROUND

The submissions of the parties, including the Statements of Undisputed Facts of Bencini (Doc. 96) and D & D (Doc. 73), Plaintiffs' Responses to both (Docs. 108 & 110), exhibits, and deposition testimony, establish the following facts.

1.  While Bencini was employed by TSG, Mayer was a Director and shareholder of TSG, and is now a vice-president of TSG. He is suing for losses resulting from investments in TSG totaling $450,000.

2.  Steward was a Director and shareholder of TSG during Bencini's employment. He is suing for losses resulting from investments in TSG totaling $500,000.

3.  Sprague was General Counsel, a vice-president, a shareholder, and a Director of TSG during Bencini's employment, and he is currently the President of TSG. He is suing for losses resulting from investments in TSG totaling $125,000.

4.  Robert Bolz is suing for losses resulting from a $50,000 investment in TSG.

TSG is a relatively small Savannah-based company that designs and builds waste water treatment facilities and desalination plants in the southeastern United States and Caribbean. In addition to designing and building plants, TSG generates recurring monthly revenue from the operation of some of those facilities. Because this recurring revenue is not enough to cover its operating expenses, TSG depends on major design-build projects to produce revenue. Since its founding in 1993, TSG has had difficulty turning a profit. TSG lost approximately $404,000 in 1996; $613,000 in 1997; $1,118,000 in 1998; and $855,138 in 1999. As far back as 1998, TSG received capital from various Plaintiffs to cover its losses. In addition to these cash infusions, TSG has also depended on a $1.5 million credit line from Darby Bank in Savannah ("Darby credit line") along with other financing. TSG's reliance on financial support from insiders continued throughout 2001, 2002, and 2003.

### Year 2000 audit

TSG hired D & D, a New York-based accounting firm, to review and audit TSG's financial statements for the year ending December 2000 and to file certain tax returns.[8] To carry out the audit, D & D was

5.  John Bolz is suing for losses resulting from a $50,000 investment in TSG.

6.  William Holden is suing for losses resulting from a $100,000 investment in TSG.

7.  OGM is a partnership consisting of Don Mayer and his two brothers. It is suing for losses resulting from investments in TSG totaling $200,000.

8.  In the engagement letter dated November 27, 2000 ("Engagement Letter"), D & D agreed to prepare a consolidated federal tax return for TSG and its includible subsidiaries, the federal and required state tax returns for TSG Water, and all required state income tax returns for TSG and its includible subsidiaries. The engagement letter says nothing about tax returns for the U.S. Virgin Islands.

given access to TSG's books and records. Plaintiffs admit that TSG provided the auditors with "full, complete and accurate information concerning all aspects of the company's finances and status of various projects," and the "core financial information from the [year 2000] general ledger" prepared while Bencini was CFO was accurate. *See* Doc. 96, ¶¶ 18, 50. On April 27, 2001, D & D issued its Report of Independent Accountants and Consolidated Financial Statements for the year 2000 ("Financial Statements").

The Financial Statements showed that, in 2000, TSG and its subsidiaries had a pre-tax loss of $122,074. However, TSG recognized a gross deferred tax asset of about $680,000, accounting for the possibility that at some point in the future, TSG would be able to use its losses in past years to offset an income tax liability incurred on future profits. After discussions with TSG management, D & D agreed to reduce the $680,000 to a $191,000 net deferred tax asset and add it to the company's $122,074 loss, yielding a net income of $68,926. Despite this apparent net income, the Financial Statements were clear: TSG had a year 2000 deficit of $2,984,511.

### TSG's financial crisis

By January 2001, TSG had created a new subsidiary called Progressive Composite Technologies ("PCT"), and the TSG Board of Directors ("Board") raised $200,000 in loans and also opened an additional $1 million line of credit for PCT.

TSG had projected positive cash flows for PCT in 2001, but PCT turned out to be a cash drain, requiring numerous infusions of cash. Not unexpectedly, PCT's cash flow troubles affected TSG.

During the first half of 2001, it became apparent that TSG was suffering financially. According to internal financial statements, through May 31, 2001, TSG registered a net loss of $782,171. TSG's troublesome financial situation was largely caused by two things: its unusually high operating costs and a dearth of large projects under contract. The "burn rate"-fixed non-project related costs such as salaries, rents, utilities, employee benefits-in the year 2000 was approximately $330,000 per month.[9] Absent large contracts, TSG lacked the cash to cover its "burn rate." By summer 2001, most of TSG's monthly expenses consisted of paying salaries and servicing its debt.

As June 2001 approached, the Burnt Store project,[10] TSG's sole project during the first half of 2001,[11] had almost been completed, and the $200,000 in loans raised for PCT and the $1.5 million Darby credit line were coming due. TSG's accounts payable continued to grow, and a subcontractor was threatening to place a lien on the Burnt Store project. Bencini reported TSG's impending financial crisis to James Walker, who was President, Chairman of the Board, and majority and controlling shareholder of TSG, and Sprague. Benci-

---

9. For a company of its size, TSG paid its executives very large salaries. TSG paid Bencini $170,000 per year, general counsel Sprague $180,000 per year, and its former President James Walker over $300,000 per year. TSG also incurred expenses for such things as an apartment in Savannah for traveling employees, Walker's $40,000 a year company vehicle, a cigarette boat in the Caribbean, and Walker's memberships in the Chatham Club, the Landings Golf Club and the St. Thomas Yacht Club.

10. Burnt Store was a design and build of a water purification facility located in Florida. According to Plaintiffs, it was the largest in the history of TSG in terms of both project scale and projected revenues.

11. TSG had contracted a design-build project for the Ritz Carlton in St. Thomas and construction was to begin in late summer or early fall 2001.

ni also prepared various cash flow projections and financial reports ("Reports") regarding TSG's operations to analyze the problem. Bencini provided these Reports to Sprague in his capacity as Vice–President, General Counsel, and Director of TSG. One report was a Consolidated TSG Financial Statement showing a net loss of $644,361 for the period ended March 31, 2001. Another report was a Cash Forecast through June 30, 2001, showing a deficit of $770,149. Bencini also created a Cash Forecast through the end of 2001 showing an ending cash balance of $1,995,878 on June 15, 2001, and the need for an immediate infusion of $500,000 to continue operations. All of these Reports provided a gloomy outlook ahead for TSG.

In addition to preparing the Reports showing TSG's distressed financial condition, Bencini proposed cost-cutting measures, including salary reductions for both Walker and Sprague. Bencini also advised Walker that he was resigning to take a long-standing job offer from another company, explaining that TSG could not afford or justify a CFO.

### The emergency board meeting

Because TSG was facing a severe financial crisis, an emergency board meeting was called for June 15, 2001 ("June 15 meeting"). In preparation for the meeting, Mayer and Steward made arrangements for an immediate loan to TSG in the aggregate amount of $500,000, Sprague undertook responsibility to prepare a memorandum outlining the causes and possible remedies for the financial crisis, and Walker undertook to prepare a cash flow projection to demonstrate TSG was still viable if the loans were approved by the Board. Plaintiffs Mayer, Steward, and

Sprague were all present at the June 15 meeting. Bencini, who was not invited, did not attend that meeting.

The Inside Investors admit they were "shocked" and "horrified" at the June 15 meeting when they learned the financial condition of TSG. The Board was told that TSG was "up-side-down"-that its accounts payable had reached an extremely high level. TSG was looking at a negative cash balance of almost $2 million for the week of June 22, 2001. An internal TSG document shows that the Board identified and discussed as reasons for this severe cash crunch (1) the loss of the Kiawah project, (2) the absence of any major projects under contract other than Burnt Store in the first half of 2001,[12] (3) the cash required by PCT, and (4) investments in an additional winder and mandrels for PCT. At the June 15 meeting, the Board did not review D & D's audit report or the Financial Statements but instead focused on "the existing and future situation, rather than the historical one." *See* Doc. 73, ¶ 16.

The Board and Walker were hoping for contracts for the Marco Shores and Frenchman's Reef projects to help TSG get out of the financial crunch it was in. At the June 15 meeting, Walker presented a "Cash Flow Forecast"[13] which indicated that if TSG could borrow $500,000 *and* obtain the Marco Shores and Frenchman's Reef project, then it could end 2001 with a negative cash flow of only $89,000. The Marco Shores and Frenchman's Reef projects were not under contract on June 15, 2001, and they were never ultimately signed.

Those who attended the June 15 meeting understood that TSG would fail and go

---

**12.** As mentioned previously, TSG had signed a contract for Ritz Carlton with construction to begin in late summer or early fall 2001.

**13.** Walker revised Bencini's 2001 year-end Cash Forecast document for presentation at the June 15 meeting.

out of business without immediate and substantial loans. When Plaintiffs Mayer, Steward, and Sprague lent money to TSG, they knew that without the loans the company would fail, and they also knew that the future of TSG depended on its obtaining the large new contracts at Marco Shores and Frenchman's Reef.

It is undisputed that without the immediate cash infusion of $500,000 in June 2001, TSG would have gone out of business. If TSG failed, then several Plaintiffs would have been called to satisfy personal guarantees on certain debts of TSG and its subsidiaries. Plaintiff Sprague had personally guaranteed up to $250,000 of TSG's debt. Plaintiff Mayer had personally guaranteed at least half of TSG's fully drawn $1.5 million Darby credit line, the entirety of a $1.5 million loan from TSG to PCT, and one third of a $750,000 personal guarantee of Plaintiff Steward. Plaintiff Steward had personally guaranteed up to $1 million of PCT's debt, and TSG still owed him around $250,000. These three Plaintiffs had a substantial and personal reason to keep TSG afloat. In fact, Sprague testified in his March 11, 2003 deposition that loaning TSG $100,000 in 2001 rather than losing $250,000 in guarantees played a role in his decision to invest.

### Solicitation of funds

It was against this backdrop that the Board authorized TSG to borrow up to $1 million, and Mayer was designated the person to raise money from outside investors. When he solicited loans from family and friends, Mayer did not furnish them with copies of the Financial Statements. Neither did he describe or provide the financial reports and information discussed at the June 15 meeting. The Outside In-

vestors admit that they trusted Mayer and relied solely on his request for the funds. The Outside Investors never saw or relied on the Financial Statements.

### Sale of PCT

With 2001 coming to an end, TSG never obtained the Marco Shores or Frenchman's Reef contracts and continued to struggle financially. TSG also decided to sell its interest in PCT, and in August 2001, entered negotiations with Bekaert Corporation ("Bekaert") to unload PCT. TSG and Bekaert discussed selling TSG's interest in PCT to Bekaert for between three to ten million dollars. Walker had estimated its worth at $7.5 million.

PCT was eventually sold to Bekaert for $4.9 million, with a $3 million "earn-out" provision, meaning Bekaert will pay up to an additional $3 million if PCT meets certain revenue targets. TSG expects to receive the $3 million "earn-out" on PCT, making the total return on the sale approximately $7.9 million. Before the sale was completed, TSG hired an appraisal firm to give an opinion on the fairness of the sales price, and the appraisal firm "opined that it was a fair transaction" for TSG. During the sales negotiations that lasted from September 2001 until the sale closed in April 2002, TSG never tried to market PCT to anyone else. In this suit, Plaintiffs seek damages for the alleged distressed sale of PCT.

### The fallout

Heading into the winter of 2001, Mayer and others concluded that Walker was the true source of the company's struggles.[14] By November 2001, Mayer, Sprague and the other directors had completed steps to dilute Walker's interest and remove him as

---

**14.** Until November 2001, Walker, as TSG's president and majority shareholder, had authority to make employment decisions, to set company policy for vehicle, travel, and discre-

tionary expenses, and to lease space for TSG companies. As such, his "tendency was to expend money now planning for rapid future growth."

President and Chairman of the Board. Thereafter, TSG retained counsel to evaluate claims against Walker for mismanagement and fraud. As a result of the investigation, the Directors concluded that Walker, while majority shareholder, President, and Chairman of the Board, had engaged in acts of mismanagement and concealed the companies' financial condition. TSG and Walker eventually entered into an agreement settling all of their disputes. Some have testified that they believe Walker to be the cause of TSG's financial difficulties.

On August 1, 2002, the Investor Plaintiffs and TSG Water filed suit in the Southern District of Georgia against D & D only. That suit was dismissed without prejudice after service on D & D was never perfected. *See TSG Water Resources, Inc. v. D'Alba and Donovan*, CV402–179. When the present captioned lawsuit was filed on October 24, 2002, in the State Court of Chatham County, Georgia, Plaintiffs added TSG Technologies as a plaintiff and Bencini as a defendant, alleging that both were Florida citizens. On December 4, 2002, Defendants jointly removed this matter to this Court. Plaintiffs subsequently filed a motion to remand asserting lack of subject matter jurisdiction. This Court denied that motion.

### PLAINTIFFS' MOTIONS

Plaintiffs request a hearing to present oral arguments on Defendants' motions for summary judgment and Plaintiffs' responses thereto (Doc. 118). Because the Court was able to rule on Defendants' motions on the pleadings, the Court finds it unnecessary to hear oral arguments on these motions. Accordingly, the Court DENIES Plaintiffs' motion for oral argument.

Plaintiffs also move the Court to reconsider its December 19, 2003 Order denying them leave to file supplemental briefs in opposition to Defendants' motions for summary judgment (Doc. 122). The Court affirms its previous order and DENIES Plaintiffs' motion for reconsideration.

### SUMMARY JUDGMENT MOTIONS

Defendants Bencini and D & D move this Court to dismiss all of Plaintiffs' pending claims against them.

### I. *Summary Judgment Standard*

Summary judgment serves to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." FED. R. CIV. P. 56 advisory committee's note, *cited in Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is appropriate only when the pleadings, depositions, and affidavits submitted by the parties indicate no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). A court must view the evidence and any inferences that may be drawn from it in the light most favorable to the nonmovant. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir.1997), *cert. denied sub nom. Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998) (citing *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

The party seeking summary judgment must first identify grounds demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Metro. Multi–List, Inc.*, 934 F.2d 1566, 1583 n. 16 (11th Cir. 1991), *cert. denied*, 506 U.S. 903, 113 S.Ct. 295, 121 L.Ed.2d 219 (1992). Such a showing shifts to the non-moving party the burden "to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions

on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed R. Civ. P. 56(e)).; *Thompson*, 934 F.2d at 1583 n. 16. A non-movant does not create a genuine issue of material fact by relying on "conclusory allegations based on mere subjective beliefs." *Plaisance v. Travelers Ins. Co.*, 880 F.Supp. 798, 804 (N.D.Ga.1994), *aff'd*, 56 F.3d 1391 (11th Cir.1995) (citing *Carter*, 870 F.2d at 585). Further, a "mere scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. Fraud/Securities Fraud Claims (Count V)

### A. Substance of claims

Plaintiffs allege that D & D and Bencini conspired to misinform Plaintiffs of the true financial condition of TSG for the purpose of presenting an optimistic depiction of TSG's finances and inducing Plaintiffs to purchase securities offered by TSG. According to Plaintiffs, this conspiracy culminated in the release of the Financial Statements, which incorrectly and materially overstated TSG's earnings for the year 2000. Plaintiffs further allege that they justifiably relied upon the Financial Statements to their harm and detriment.

### B. Discussion

■ The tort of fraud has five essential elements: (1) false representation by a defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting in reliance upon the representation; (4) justifiable reliance by the plaintiff upon the representation; and (5) damage to the plaintiff directly and proximately caused by the reliance. *Middleton v. Troy Young*

*Realty, Inc.*, 257 Ga.App. 771, 772, 572 S.E.2d 334, 336 (2002); *Reeves v. Edge*, 225 Ga.App. 615, 617–18, 484 S.E.2d 498, 501 (1997). To prove securities fraud under Georgia law, a plaintiff must show (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which the plaintiff relied, (5) that proximately caused his injury. *GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc.*, 245 Ga.App. 460, 464, 537 S.E.2d 677, 682 (2000).

### 1. No proximate cause

■ "Although the question of proximate cause is ordinarily for the jury to decide, plain and indisputable cases may be decided by the court as a matter of law. In such plain cases, the inquiry is whether the causal connection between the defendant's conduct and the injury is too remote for the law to countenance a recovery." *Thomas v. Food Lion, LLC*, 256 Ga.App. 880, 883, 570 S.E.2d 18, 21 (2002). The Court finds this is one of those plain and indisputable cases.

■ The Court finds that the damages claimed by TSG did not, as a matter of law, proximately flow from alleged misrepresentations contained in D & D's audit and Financial Statements. The alleged damages were too far removed and there were too many intervening causes. The financial mess into which TSG had fallen was not a result of erroneous Financial Statements, but instead a result of TSG's high expenses and no major income generation. Walker, as TSG's president and majority shareholder, had the authority to make employment decisions and set company policy on discretionary spending. There is no evidence to suggest that he would have changed TSG's spending policies had he known that the Financial Statements were erroneous. In fact, there is no evidence to suggest his decisions

were at all influenced by the Financial Statements. The Financial Statements were, by May 2001, almost irrelevant to TSG's cash flow problems. TSG had amassed a deficit approaching $700,000 by that time and needed new design projects to remain viable.

Walker had access to updated 2001 financial data, and many interim reports had been produced showing the negative cash flows of TSG. Walker knew or should have known about TSG's precarious financial position, but failed to reduce expenditures. Walker's failure to change spending habits or his decision not to inform board cannot be imputed to D & D or Bencini. TSG, as any rationally run business, had an economic incentive to minimize its unnecessary expenses with or without an audit report. The record contains no evidence that Walker would have done anything differently, and without this evidence there is nothing to causally connect TSG's claimed damages to D & D's audit report.

Although they claim that if they had been provided a true and accurate financial picture of TSG, they would not have continued to allow Walker to continue operations as he had been, Plaintiffs have presented no evidence to show how the Board would have been able to do this. In fact, the vehicle through which Walker's control was finally severed was the dilution of shares caused by the investment capital of the Investor Plaintiffs. There is no evidence in the record to suggest that Walker would have voluntarily relinquished control of TSG in May or June 2001. Plaintiffs' "belief" that he would have lost control earlier than he did does not create a genuine issue of material fact. *See Pace v. Capobianco,* 283 F.3d 1275, 1278–79 (11th Cir.2002)("an affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judg-

ment...."). Any damages TSG allegedly sustained as a result of erroneous Financial Statements relate to the contract price paid for the audit and the money spent to have TSG re-audited, not to damages that flowed from alleged misrepresentations or omissions.

### 2. No justifiable reliance

■ Both fraud and securities fraud require a similar finding of justifiable reliance on the part of Plaintiffs, *GCA Strategic Inv. Fund,* 245 Ga.App. at 464, 537 S.E.2d 677, so the Court addresses these claims together. "To show justifiable reliance on the misrepresented or omitted information sufficient to constitute securities fraud, [Plaintiffs] must show that 'with the exercise of reasonable diligence [they] still could not have discovered the truth behind the fraudulent omission or misrepresentation.'" *GCA Strategic Inv. Fund,* 245 Ga.App. at 464, 537 S.E.2d 677 (quoting *Gochnauer v. A.G. Edwards & Sons,* 810 F.2d 1042, 1047 (11th Cir.1987)). To prove justifiable reliance for fraud, Plaintiffs must show that they exercised their duty of due diligence. *Reeves,* 225 Ga. App. at 618, 484 S.E.2d 498. While questions of due diligence often must be resolved by the trier of fact, one may fail to exercise due diligence as a matter of law. *Fowler v. Overby,* 223 Ga.App. 803, 804, 478 S.E.2d 919, 921 (1996). "The law does not afford relief to one who suffers by not using the ordinary means of information, whether the neglect is due to indifference or credulity." *Fann v. Mills,* 248 Ga.App. 460, 463, 546 S.E.2d 853, 857 (2001). The record contains no evidence showing there was justifiable reliance on the part of the Investor Plaintiffs.

### a. Inside Investors

■ After reviewing the record, the Court questions whether the Inside Inves-

tors actually relied on the Financial Statements at all when making their decision to invest in TSG in the summer of 2001. However, viewing the evidence most favorably to the Inside Investors, and assuming they did rely on the Financial Statements, it is nonetheless clear that they did not justifiably rely upon them. Reliance upon the Financial Statements alone would not be sufficient to reach the threshold level of due or reasonable diligence. As the Georgia Court of Appeals explained,

> the ultimate decision to invest is often based on a number of factors that have little to do with an accountant's audit report. After all, an auditing Certified Public Accountant rarely examines every aspect of a client's business, has little or no expertise or control over a client[']s products, services, or markets, and does not choose or control the client's executives or make its business decisions. . . . Thus, an investment decision based solely or primarily on an accountant's audit report would be, in most cases, difficult to justify. . . . Moreover, [a]s a matter of economic and social policy, third parties should be encouraged to rely on their own prudence, diligence, and contracting power, as well as other informational tools. This kind of self-reliance promotes sound investment and credit practices and discourages the careless use of monetary resources. If, instead, third parties are simply permitted to recover from the auditor for mistakes in the client's financial statements, the auditor becomes, in effect, an insurer of not only the financial statements, but of bad loans and investments [as well].

*White v. BDO Seidman, LLP,* 249 Ga.App. 668, 672–73, 549 S.E.2d 490, 494 (2001)(internal citations and quotations omitted).[15]

The Inside Investors were all present at the June 15 meeting where the Board discussed the financial problems that had befallen TSG, and they were aware of the bleak outlook that potentially lay ahead.[16] If it did not receive a cash infusion of $500,000 and obtain the Marco Shores and Frenchman's Reef projects, then TSG was projected to have a negative cash balance of almost $2 million by the end of 2001. Steward admits in deposition testimony that, based on the detailed presentation of the financial situation and cash requirements of TSG by Sprague and Walker at the June 15 meeting, he and the other board members had a fair and accurate understanding of TSG's financial condition as of June 15, 2001. Sprague admits that before he made any loans in June 2001, he was aware of TSG's then-current financial situation. Mayer admits that he, along with the other directors at the June 15 meeting, knew that neither Marco Shores nor Frenchman's Reef were under contract at that date, and Mayer admits that he knew of the risk of not getting those projects. Mayer also admits that there had been a substantial change of circumstances relating to the financial condition of TSG from December 2000 to June 2001.

It appears that, in this instance, the Inside Investors' rosy expectations of TSG's future clouded their judgment. They had sufficient notice to be put on inquiry to further explore the financial

---

**15.** Although *White* discusses justifiable reliance in the context of negligent misrepresentation, Georgia Courts engage similar analysis when addressing fraud. *See e.g., Paul v. Destito,* 250 Ga.App. 631, 550 S.E.2d 739 (2001); *Real Estate Int'l, Inc. v. Buggay,* 220 Ga.App. 449, 469 S.E.2d 242 (1996).

**16.** The Court finds unpersuasive Plaintiffs' attempts to characterize TSG's June 2001 severe cash flow problem as a short-term cash shortfall.

health of TSG before making any more investments in the company. "Notice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found such inquiry might have led. Ignorance of a fact, due to negligence, shall be equivalent to knowledge, in fixing the rights of the parties." *Real Estate Int'l, Inc. v. Buggay,* 220 Ga. App. 449, 452, 469 S.E.2d 242, 245 (1996). Given the information known by and available to them, the Inside Investors failed, as a matter of law, to exercise due or reasonable diligence. Thus, any damage they may have suffered as a result of the Financial Statements is attributable to their own lack of diligence and not to their justifiable reliance upon any alleged misrepresentation contained in the Financial Statements. The Inside Investors claims for fraud and securities fraud fail as a matter of law.

### b. Outside Investors

■■■ The Outside Investors have admitted in deposition testimony that they did not actually rely on the Financial Statements when deciding to invest in TSG in the summer of 2001. Plaintiffs Holden, John Bolz, and Robert Bolz have stated that they did not rely on any financial statements produced by Bencini or D & D, and instead relied solely on the representations and recommendation of Plaintiff Mayer.[17] The OGM partnership, consisting of Plaintiff Mayer and his two brothers, likewise relied solely on Mayer's assurances that TSG had turned a corner when deciding to invest in TSG in summer 2001.[18] However, even assuming that the Outside Investors relied on the Financial Statements, and viewing all inferences in favor of the Outside Investors, the record clearly shows that these Plaintiffs failed to exercise due or reasonable diligence. The Outside Investors were not your average investors they were all sophisticated businessmen in their own right.[19] As such, a greater diligence is required before reliance may be considered justified. *See William Goldberg & Co. v. Cohen,* 219 Ga.App. 628, 631, 466 S.E.2d 872, 877 (1995); *GCA Strategic Inv. Fund,* 245 Ga. App. at 465, 537 S.E.2d 677.

The record is totally devoid of evidence of any efforts made by the Outside Investors to independently verify any statements made by Mayer, let alone to verify the unseen Financial Statements. The Outside Investors did not rely on any documents or ask for internal financial state-

17. The Outside Investors all admit that they relied solely or primarily on the recommendation of Mayer in making their investment decision. Their argument of "indirect reliance" through Mayer is seemingly precluded by *White,* 249 Ga.App. at 671–672, 549 S.E.2d 490 (rejecting indirect reliance theory and requiring actual reliance in negligent misrepresentation claim against accounting firm).

18. Mayer stated in deposition testimony that when talking to his brothers about this investment, he did not discuss the 2001 financial status of TSG.

19. John Bolz has a degree in economics and is the investment advisor and manager (and has been for about 20 years) of a family trust with assets in excess of $1 million. Robert Bolz attended Harvard Business school for one year, was an accredited investor in the summer of 2001 as defined by federal securities law, and had previously served as a vicechairman of the board of Oscar Mayer. Holden has a degree in business, is an accredited investor as defined by federal securities law, and has served as the CEO of at least two companies, as well as serving on the board of directors of Wachovia Bank. Mayer has a bachelor's degree in general studies and economics from Harvard University, has a master of science in business and labor relations, and a law degree from the University of Michigan Law School. Mayer has served as vice president and general counsel of Gulfstream and has been involved in several entrepreneurial ventures.

ments when making their decision to loan money to TSG. At least six months had passed since the period covered by the Financial Statements by the time the Outside Investors were called upon to invest in TSG in summer 2001. But the Outside Investors did not inquire into the financial condition of TSG in the summer of 2001. John Bolz knew when he made the July 2001 investment that TSG had not yet repaid the loan he made in January 2001. And at the time of the July 2001 investment, Mayer told him "very little" about the financial condition of TSG. Robert Bolz relied on Mayer's assurances that TSG had turned around financially. He did not ask to see any proof. Robert Bolz did not consult any financial advisors or anyone else before making this July 2001 investment. Holden admitted in deposition testimony that he "basically made [his] decision on what [Mayer] was telling [him]." Holden Dep. at 9. He did not ask for a prospectus, he did not talk to Mayer about any of TSG's internal financial statements, and he did not ask to see TSG's books or records.

The record reveals, unquestionably, that the Outside Investors did not exercise due diligence. Thus, there is no genuine issue of material fact concerning whether they justifiably relied on D & D's audit or the Financial Statements when they invested in TSG in the summer of 2001. Accordingly, the Outside Investors' fraud and securities fraud claims against Bencini and D & D fail as a matter of law.

### 3. No intent

 Plaintiffs have also failed to present sufficient evidence to create a genuine issue of material fact as to the requisite intent for their fraud claim. Assuming that Bencini and D & D had the requisite scienter in the production of the Financial Statements, the record contains no evi-

dence that D & D or Bencini intended to induce TSG or the Investor Plaintiffs to act or refrain from acting in reliance upon the Financial Statements. "A misrepresentation is intended to deceive where there is intent that the representation be acted upon by the other party." *Petzelt v. Tewes,* 260 Ga.App. 802, 805, 581 S.E.2d 345, 347 (2003). There is no evidence to support the claim that Bencini and D & D knew that the Financial Statements would be used in connection with an offer to sell securities in TSG or that the Investor Plaintiffs would be solicited for investment capital.

### III. Breach of Fiduciary Duty Claim Against Bencini (Count II)

 "The business judgment rule protects directors and officers from liability when they make good faith business decisions in an informed and deliberate manner." *Munford, Inc. v. Valuation Research Corp.,* 98 F.3d 604, 611 (11th Cir. 1996). Under the business judgment rule officers are presumed to have acted properly and in good faith, and may be liable "for their actions only when they are shown to have engaged in fraud, bad faith or an abuse of discretion." *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 574 (11th Cir.1988).

It is undisputed that Bencini accurately recorded TSG's "core financial information" in the general ledger and provided D & D with "full, complete and accurate information concerning all aspects of the company's finances and status of various projects." Doc. 96, ¶¶ 18, 50. Plaintiffs' complaint essentially centers on the alleged erroneous accounting treatment Bencini applied to some financial data. Accounting is by its nature an inexact science and necessarily requires the exercise of business judgment.

■ By relying on outside accounting experts, Bencini discharged his duty to act in an informed and deliberate manner as required under the business judgment rule. *See Munford,* 98 F.3d at 611; *Cottle,* 849 F.2d at 578. The mistakes Plaintiffs allege involve decisions as to the application of relevant accounting principles. There are no allegations of self-dealing on the part of Bencini. In the event Bencini incorrectly applied accounting standards, Bencini reasonably relied upon D & D, as independent auditors, to review TSG's financial statements and confirm that the proper accounting treatment had been applied. More importantly, the record shows that (1) Bencini reported TSG's true financial condition to his superior, Walker, who was responsible for reporting to the Board regarding the operations, activities, and financial affairs of TSG, and that (2) because Bencini was not present at the June 15 meeting, he cannot be responsible for any statements said or unsaid by Walker at that meeting.

In that the record does not contain sufficient evidence on which a reasonable jury could find that Bencini committed fraud, acted in bad faith, or abused his discretion, the business judgment rule precludes any claim for breach of fiduciary duty against Bencini. Therefore, Plaintiffs' claim for breach of fiduciary duty against Bencini fails as a matter of law.

## IV. Breach of Fiduciary Duty Claim Against D & D (Count III)

■ Plaintiffs allege that, at all relevant times, a fiduciary relationship existed between D & D and Plaintiffs. Plaintiffs further allege that D & D breached its fiduciary duty by failing to audit TSG's Financial Statements in accordance with Generally Accepted Auditing Standards ("GAAS") and by failing to advise the TSG Board of the inappropriate financial trans-

actions involving Walker. A claim for breach of fiduciary duty requires (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach. *Griffin v. Fowler,* 260 Ga.App. 443, 445, 579 S.E.2d 848, 850 (2003).

■ Generally, an accountant hired to audit the financial statements of a client is not a fiduciary of the client, but rather is required to be independent of the client. *See, e.g., Resolution Trust Corp. v. KPMG Peat Marwick,* 844 F.Supp. 431, 436 (N.D.Ill.1994)(holding independent auditor not in fiduciary relationship with client); *FDIC v. Schoenberger,* 781 F.Supp. 1155, 1157 (E.D.La.1992)(finding accountants do not owe fiduciary duty to clients when providing services as auditors); *Franklin Supply Co. v. Tolman,* 454 F.2d 1059, 1065 (9th Cir.1971)(holding accounting firm not in fiduciary relationship with client); *Micro Enhancement Int'l. Inc. v. Coopers & Lybrand, LLP,* 110 Wash.App. 412, 434, 40 P.3d 1206, 1218 (2002)(holding absent special circumstances, auditor is not fiduciary of client). D & D was hired by TSG to perform an *independent* audit of its financial statements and file certain tax returns. As an independent auditor, D & D was not a fiduciary of, and owed no fiduciary duties to, TSG. Accordingly, TSG, as a matter of law, cannot claim a breach of fiduciary duty by D & D.

■ Generally, accountants owe no fiduciary duties to third parties who have no contractual or other relationship with the accountants. *See, e.g. Baldwin v. Kulch Assocs., Inc.,* 39 F.Supp.2d 111, 121 (D.N.H.1998)(finding no fiduciary duty from accountant to third party investors); *Venturtech II v. Deloitte Haskins & Sells,* 790 F.Supp. 576, 588 (E.D.N.C.1992)(finding no fiduciary duty from accountant to third party investors because, although element of trust or confidence present, no

element of superiority or influence); *Gutfreund v. Christoph*, 658 F.Supp. 1378 (N.D.Ill.1987)(finding no fiduciary duty from accountant to third party without "close relationship" with accountant); *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 24, 945 P.2d 317, 335 (1996)(finding no fiduciary duty from accountant to third party buyer, because mere reliance on accountant's superior knowledge does not transform a duty of ordinary care into a fiduciary duty). The Investor Plaintiffs in this case are all third parties to the audit contract between D & D and TSG, and D & D had no relationship with them, professional or otherwise. Thus D & D owed no fiduciary duties to those plaintiffs, and the Investor Plaintiffs' claims against D & D for breach of fiduciary duty fail as a matter of law.

## V. Negligence Claims (Counts I & IV)

Plaintiffs' assert claims for professional negligence and ordinary and/or gross negligence against D & D. Specifically, Plaintiffs allege D & D did not conduct its audit in accordance with GAAS and grossly and materially overstated TSG's earnings for the year ended December 31, 2000. Plaintiffs also allege that D & D failed to advise TSG of the requirement to file tax returns for the U.S. Virgin Islands and failed to alert them to inappropriate financial transactions by Walker.

### A. Investor Plaintiffs

#### 1. Professional Negligence Claim

■■■■■■■ Georgia law "provides only one cause of action to persons who are not clients of an accounting firm but who wish to sue the firm and any of its accountants for professional negligence: an action for

negligent misrepresentation." *White*, 249 Ga.App. at 670, 549 S.E.2d 490. "The essential elements of negligent misrepresentation are '(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance.'" *Marquis Towers, Inc. v. The Highland Group*, 265 Ga.App. 343, 593 S.E.2d 903, 906 (2004)(quoting *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas, Inc.*, 267 Ga. 424, 426(1), 479 S.E.2d 727 (1997)). To prevail, Plaintiffs must show that they are persons, or in the limited class of persons, who the professional is "actually aware" will rely upon the information prepared. *Martha H. West Trust v. Market Value of Atlanta, Inc.*, 262 Ga. App. 90, 92, 584 S.E.2d 688, 691 (2003); *Badische Corp. v. Caylor*, 257 Ga. 131, 133, 356 S.E.2d 198, 200 (1987). "[W]here the plaintiffs are third parties who are not in privity with the party alleged to have made the negligent misrepresentation, recovery may be had only when the 'known third party's reliance was the desired result of the misrepresentation.'" *Martha H. West Trust* at 92, 584 S.E.2d 688; *White*, 249 Ga.App. at 670, 549 S.E.2d 490.

■■■■■ The Investor Plaintiffs were not clients of D & D at any time relevant to this case. The record contains no evidence showing that D & D was actually aware that any of the Investor Plaintiffs would be making loans to TSG and that D & D knew that they would rely on the information contained in their audit when making loans to TSG.[20] Additionally, there is not sufficient evidence to create a genuine issue of material fact regarding reasonable reliance. The reasonable reliance element is

---

**20.** The Engagement Letter explicitly states that D & D's audits were not "planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction." (Defs.' Ex. 1, p. 2).

similar to the justifiable reliance element of fraud. As discussed *supra*, the Investor Plaintiffs did not justifiably rely, if they relied at all, on D & D's audit report. Accordingly, the Investor Plaintiffs' claims of professional negligence fail as a matter of law.

## 2. Ordinary/Gross Negligence claim

■ To maintain a cause of action for ordinary negligence, a plaintiff must prove the following elements: (1) a legal duty to conform to a standard of conduct; (2) a breach of this duty; (3) a causal connection between the conduct and the resulting injury; and (4) damage to the plaintiff. *Martha H. West Trust*, 262 Ga.App. at 91, 584 S.E.2d 688. In order to prevail on their claims of negligence, the Investor Plaintiffs must show a causal connection between the conduct and the resulting injury. *Martha H. West Trust*, 262 Ga.App. at 91, 584 S.E.2d 688. "Although the question of proximate cause is ordinarily for the jury to decide, plain and indisputable cases may be decided by the court as a matter of law. In such plain cases, the inquiry is whether the causal connection between the defendant's conduct and the injury is too remote for the law to countenance a recovery." *Thomas*, 256 Ga.App. at 883, 570 S.E.2d 18. The Court finds this is one of those plain and indisputable cases.

■ Viewing all inferences in favor of the Investor Plaintiffs, the record contains no evidence that the Financial Statements were the proximate cause of the Investor Plaintiffs' damages. There is no evidence on which a jury could reasonably find that the Investor Plaintiffs invested money in TSG because of the information contained in the Financial Statements. Even if that were the case, the Investor Plaintiffs did not lose their investment because of any errors contained in the Financial Statements, but instead because of the lack of income generated by TSG. The Investor Plaintiffs' claims for negligence fail as a matter of law.

## B. TSG claims

■ TSG has presented sufficient evidence to create a genuine issue of material fact concerning D & D's alleged professional, ordinary, and gross negligence. *See* Expert Witness Report of Mark I. Murovitz (Doc. 52). The Court notes that the damages for which D & D may be liable are potentially limited in two ways: (1) by the terms of the contractual agreement between TSG and D & D [21] and (2) by the causation element of the tort of negligence.[22] However, the Court will not make that determination at this time.

## VI. Breach of Contract Claim (Count VI)

Plaintiffs allege that D & D had an obligation to audit and report TSG's financial statements in accordance with GAAS pursuant to the agreement between TSG and D & D. Plaintiffs further allege that D & D breached the terms of the agreement by failing to perform its audit under GAAS standards and by performing its services

21. The Engagement Letter contains an indemnity clause and an exculpatory clause, which states "In no event shall [D & D] be liable to [TSG], whether a claim be in tort, contract or otherwise, for any consequential, indirect, lost profit or similar damages relating to [D & D's] services provided under this engagement letter, except to the extent finally determined to have resulted from the willful misconduct or fraudulent behavior of [D & D] relating to such service."

22. The Court questions whether most of the damages claimed by TSG were proximately caused by the alleged negligent audit report and Financial Statements, but it will not make that determination at this time.

in a negligent, incompetent, and misleading manner. Plaintiffs claim to be either direct or third-party beneficiaries of the agreement.

### A. Investor Plaintiffs

■■■■■ All Investor Plaintiffs must assert their claim for breach of contract as third party beneficiaries because they were not parties to the audit contract. "In order for a third party to have standing to enforce a contract it must clearly appear from the contract that it was intended for his benefit. The mere fact that he would benefit from performance of the agreement is not alone sufficient. Unless such an intention is shown from the face of the contract, defendant is under no duty and consequently plaintiff acquires no right as the third party beneficiary." *McClung Surveying, Inc. v. Worl*, 247 Ga.App. 322, 325–26, 541 S.E.2d 703, 707 (2000). "A contract is intended to benefit a third party when the promisor engages to the promisee to render some performance to a third person." *Id.*

■■■■ The Engagement Letter, set the terms of D & D's audit. When looking at the face of the contract, the Court finds no intent to benefit any of the Investor Plaintiffs. To the contrary, the Engagement Letter explicitly states that the audits were intended for the benefit of "the Company" and not for third parties. The Engagement Letter states that "[t]he audits will not be planned or conducted in contemplation of reliance by any third party or with respect to any specific transaction." The integration clause in the Engagement Letter states that the letter represents the entire agreement between D & D and TSG, and Plaintiffs have not alleged or presented evidence that there was a separate agreement designating the Investor Plaintiffs as third-party beneficiaries. Because the record clearly shows that the Investor Plaintiffs were not intended third-party beneficiaries, they have no standing to sue on this claim. Accordingly, the Investor Plaintiffs' breach of contract claim fails as a matter of law.

### B. TSG

According to the terms of the contract between D & D and TSG, D & D was obligated to perform its audit in accordance with GAAS. The record contains sufficient evidence to create a genuine issue of material fact on TSG's claim for breach of contract against D & D. *See* Expert Witness Report of Mark I. Murovitz (Doc. 52). The Court notes, however, that the damages claimed by TSG are potentially limited,[23] but the Court will not make that determination at this time.

### VII. Negligent Retention and Supervision Claim (Count VII)

■■■■ Plaintiffs allege that D & D was negligent in its retention and/or supervi-

---

**23.** The contract damages may be limited by the contract's indemnity clause, the contract's exculpatory clause, or by general contract law. "Damages growing out of a breach of contract, in order to form a basis of recovery, must be such as could be traced solely to the breach, be capable of exact computation, must have arisen according to the usual course of things, and be such as the parties contemplated as a probable result of such breach. The measure of damages in the case of a breach of contract is the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it entailed. In other words, the person injured is, so far as it is possible to do so by a monetary award, to be placed in the position he would have been in had the contract been performed. An injured party can not be placed in a better position than he would have been in if the contract had not been breached." *Crawford & Assocs., Inc. v. Groves–Keen, Inc.*, 127 Ga. App. 646, 650, 194 S.E.2d 499, 502 (1972)(internal quotations and citations omitted); *see also* O.C.G.A. § 13–6–2.

sion of its employees or agents. In order to maintain an action for negligent retention and supervision, a plaintiff must show that the employer knew or should have known of the employee's propensity to engage in the conduct which caused the plaintiff's injury. *Herrin Bus. Prods., Inc. v. Ergle*, 254 Ga.App. 713, 717, 563 S.E.2d 442, 446 (2002); *Brooks v. H.J. Russell & Co.*, 66 F.Supp.2d 1349, 1355 (N.D.Ga. 1999). Proof of such propensity must consist of evidence substantially related to the injury-causing conduct. *Herrin Bus. Prods.*, 254 Ga.App. at 713, 563 S.E.2d 442.

■ Other than the conduct alleged in the present suit, Plaintiffs have offered no evidence showing that any of D & D's employees had a propensity to engage in any fraudulent or negligent conduct. On the other hand, D & D has presented evidence showing that none of the auditors involved has ever been sued for or accused of negligence or any other professional misconduct. Plaintiffs' mere allegations of negligent retention and/or supervision are not sufficient to create a genuine issue of material fact. Thus, even if the auditors may have been negligent in conducting TSG's year 2000 audit and producing the Financial Statements, Plaintiffs have not shown how D & D knew or should have known of a propensity for this alleged conduct. Accordingly, Plaintiffs' negligent retention and supervision claim fails as a matter of law.

## VIII. Punitive Damages and Attorneys' Fees Claims (Counts VIII & IX)

■ Plaintiffs assert that they are entitled to punitive damages because Defendants breached their fiduciary duties and because Defendants' actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences. In order for Plaintiffs to recover punitive damages, Defendants alleged "culpable conduct must be more than negligence, even gross negligence." *Taylor v. Powertel, Inc.*, 250 Ga. App. 356, 357, 551 S.E.2d 765, 768 (2001). As previously discussed, the record does not contain sufficient evidence to create a genuine issue of material fact as to fraud, malice, or willful misconduct on the part of Defendants. The evidence contained in the record shows that, at most, Defendants may have been grossly negligent in conducting TSG's year 2000 audit. Thus, Plaintiffs are not entitled to punitive damages, and their claim fails as a matter of law.

■ Plaintiffs also argue that they are entitled to statutory attorney's fees because Defendants have acted in bad faith in its dealings with Plaintiffs and have caused Plaintiffs unnecessary trouble and expense. " 'Bad faith' is not simply bad judgment or negligence, but it imports a dishonest purpose or some moral obliquity, and implies conscious doing of wrong, and means breach of known duty through some motive of interest or ill will." *Rapid Group, Inc. v. Yellow Cab of Columbus, Inc.*, 253 Ga.App. 43, 49, 557 S.E.2d 420, 426 (2001)(quoting *Vickers v. Motte*, 109 Ga.App. 615, 619–20, 137 S.E.2d 77(1964)). "[B]ad faith cannot be prompted by an honest mistake as to one's rights or duties but must result from some interested or sinister motive." *Id.* "[P]roof of mere negligence or bad judgment is not proof that [Defendants] refused to fulfill [their] professional duties, out of some interested or sinister motive, or that [they] consciously acted for some dishonest or improper purpose." *Id.* (quoting *Michaels v. Gordon*, 211 Ga.App. 470, 473, 439 S.E.2d 722 (1993)). There is no competent evidence in the record that indicates Defendants acted in bad faith.

**1232**

█ When there is no bad faith and the only other asserted basis for recovery of attorneys fees is the causing of unnecessary trouble and expense, "there is not 'any evidence' to support an award pursuant to [O.C.G.A. § 13–6–11] if a bona fide controversy clearly exists between the parties." *Backus Cadillac–Pontiac, Inc. v. Brown,* 185 Ga.App. 746, 747, 365 S.E.2d 540, 541 (1988)(quoting *Buffalo Cab Co. v. Williams,* 126 Ga.App. 522, 525, 191 S.E.2d 317 (1972)). Thus, if the evidence shows that "a genuine dispute exists-whether of law or fact, on liability or amount of damages, or on any comparable issue, then attorney fees are not authorized under O.C.G.A. § 13–6–11." *Id.* The record contains evidence showing that there is a bona fide controversy in this case, and thus, Plaintiffs are not entitled to attorneys fees based on unnecessary trouble and expense. Accordingly, Plaintiffs claim of attorneys fees fails as a matter of law.

### MOTION FOR INDEMNIFICATION

█ Bencini moves the Court to order TSG to advance his legal fees and expenses relating to this lawsuit. The Court construes Bencini's motion for advance of legal fees and expenses as a motion for indemnification of legal fees and expenses.

Article 8, Part 5 of the Georgia Business Corporation Code addresses indemnification and advances for expenses related to litigation for officers of a corporation. See O.C.G.A. §§ 14–2–850 to –859. Code Section 14–2–857(c) grants an officer of a corporation who is not a director mandatory indemnification under Code Section 14–2–852 and allows the officer to "apply to a court under Code Section 14–2–854 for indemnification or advances for expenses . . . to the same extent to which a director may be entitled to indemnification or advances for expenses . . . ." It is under O.C.G.A. § 14–2–854 that Bencini seeks a court-ordered advance of expenses, or indemnification.

This Court is required to order indemnification or advances for expenses where it determines that the officer is entitled to indemnification under Part 5 of the Georgia Business Corporation Code. O.C.G.A. § 14–2–854(a)(1). Georgia law requires a corporation to indemnify an officer who was wholly successful on the merits in the defense of a proceeding to which he was a party because he was an officer of the corporation. O.C.G.A. § 14–2–852. This mandatory indemnification covers the reasonable expenses incurred by the officer in connection with that proceeding. *Id.*

Bencini was named as a party in this action because he was the CFO of TSG. Because his motion for summary judgment has been granted and the claims against him have been dismissed, Bencini has been wholly successful on the merits in defense of this suit. Accordingly, the Court **GRANTS** Bencini's motion for indemnification, and **ORDERS** TSG to indemnify Bencini for the reasonable expenses and legal fees incurred by him both in defending this action and in seeking indemnification for legal fees and expenses. The Court **ORDERS** Bencini, no later than 14 days after the date of this Order, to file with this court an affidavit enumerating the reasonable legal fees and expenses incurred in defending this action, including any fees and expenses related to the motion for advance of legal fees. Plaintiffs will have 7 days after the filing of Bencini's affidavit to file a response.

The Court **GRANTS** Bencini's motion for summary judgment and dismisses all claims against him. The Court **PARTIALLY GRANTS** D & D's motion for summary judgment dismissing all claims of Plaintiffs Mayer, Steward, Sprague, John Bolz, Robert Bolz, Holden, and OGM, and dismissing TSG's claims for fraud/securi-

ties fraud, breach of fiduciary duty, negligent retention and supervision, punitive damages, and attorneys' fees. TSG's claims for professional negligence, ordinary and/or gross negligence, and breach of contract are not dismissed.

The Court **DENIES** Plaintiffs' motion for oral argument and motion for reconsideration.

So ORDERED.