Frederick McDONALD, Mary McDonald, and Fred R. McDonald, Plaintiffs–Appellants,

v.

ALAN BUSH BROKERAGE COMPANY and William R. Dodson, Defendants–Appellees.

No. 87–5418.

United States Court of Appeals, Eleventh Circuit.

Jan. 17, 1989.

Russell L. Forkey, Pamela M. Burdick, Steven G. Goerke, Deerfield Beach, Fla., for plaintiffs-appellants.

David P. Ackerman, Scott J. Link, West Palm Beach, Fla., for defendants-appellees.

Before HILL and ANDERSON, Circuit Judges, and THOMAS*, Senior District Judge.

ANDERSON, Circuit Judge:

Plaintiffs-appellants filed a complaint in district court on June 3, 1985, alleging violation of securities laws. A jury trial commenced on the claim brought pursuant to Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. Section 78j(b), and Rule 10b–5, 17 CFR 240.10b–5, promulgated thereunder. At the close of the plaintiffs-appellants' case, the district court granted defendants-appellees' motion for a directed verdict on four grounds: 1) that plaintiffs failed to exercise due diligence in the handling of their accounts; 2) that the action was not brought within the applicable statute of limitations; 3) that defendants did not act with scienter; and 4) that plaintiffs were estopped from maintaining this action. The district court issued a written order to this effect. Appellants filed timely notice of appeal to this court.

On appeal appellants contend that the district court erred in directing a verdict for defendants. We need address only one of the grounds of the district court order—absence of scienter—to conclude that the court was not in error.[1] Accordingly, the judgment of the district court is affirmed.[2]

## I. FACTS

In November of 1980 appellants Frederick McDonald, his wife Mary McDonald and son Fred R. McDonald opened an account with appellees Alan Bush Brokerage Company and William R. Dodson, account executive. Frederick McDonald (McDonald) was the only active participant in the account.[3] Dodson was McDonald's account executive with Alan Bush from the time he opened the account until March of 1984. McDonald maintained his account with Bush until the late summer of 1984.

Although Dodson would make recommendations to McDonald, Dodson did not independently undertake purchases or sales without McDonald's approval. McDonald followed Dodson's recommendations more often than not. At times, however, McDonald originated his own suggestions of preferred purchases.

McDonald was an experienced investor in the stock market who had invested in stock options prior to his coming to Bush.[4] In 1978, McDonald opened an account at Mer-

---

* Honorable Daniel H. Thomas, Senior U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. All of the alleged wrongful transactions with respect to the Baldwin–United stock occurred before June 3, 1983. Because plaintiffs-appellants did not adduce sufficient evidence of fraudulent concealment, any action based on this stock would also be barred by the two-year statute of limitations. With respect to the Baldwin–United stock, the statute of limitations bar is an alternate holding.

2. In addition to their principal claims that the trial court erred in granting a directed verdict motion, appellants contend that the trial court erred (1) in sustaining appellees' objection to appellants' attempts to examine Dodson fully concerning his knowledge of, and responsibilities to, the McDonalds; (2) in preventing appel-

lants from fully examining Bush research director John Doherty concerning Mitel; and (3) in limiting plaintiffs' expert Murfey's testimony on brokers' duties, the suitability of Dodson's recommendations, and other opinions necessary to prove scienter. These claims are without merit and warrant no discussion.

3. Mary McDonald and Fred R. McDonald appeared on the account only for estate planning reasons.

4. Appellants contend that McDonald suffered from impaired vision, which prevented him from reading for any length of time. However, McDonald testified that, despite his blindness in one eye, with his reading glasses, "I can read fine." R. 7:173.

rill Lynch, where he originated half of the investment transactions he entered into, including transactions involving options. After leaving Merrill Lynch, McDonald opened and maintained concurrent trading accounts with Raymond James & Associates and Ovest Securities, Inc., an "order taking firm" at which 100% of the transactions were initiated by the customer. In eleven months with Raymond James and Ovest, McDonald executed 193 option transactions.

When McDonald opened his account with Alan Bush, he entered into an Option Agreement and completed an Options Trading Questionnaire on which he indicated his investment goals as income, growth and trading profits. The documents also spelled out the risks of options trading.[5] Dodson recommended to McDonald the purchase of certain securities for the purpose of implementing an investment strategy employing listed stock options in conjunction with the recommended securities.

McDonald does not contend that Dodson's actions were intentional. In fact, he conceded at trial that "I knew [Dodson] was a good guy. I knew he was working in my best interest all the time." R. 6:89. Moreover, Dodson himself lost approximately $35,000 on his own investments in one of the stocks at issue during the same time period. McDonald does contend that Dodson's recommendations with respect to three stocks—Baldwin-United, Storage Technology, and Mitel—included reckless misrepresentations and omissions.[6]

### Baldwin–United

On March 9, 1983, Dodson first recommended that McDonald purchase the common stock of Baldwin–United. McDonald testified that, prior to McDonald's purchase of Baldwin–United on March 16, 1983, Dodson stated, "I'll recommend a stock which is very good and which is well known, that's Baldwin." R.6:82. Dodson testified that his recommendation of Baldwin–United rested on its "A" rating from Standard & Poors in late 1982, the fact that Baldwin–United had just taken over a company whose stock McDonald had previously traded with other brokers, that Baldwin–United's "bullish" quality was evidenced by its acquisition of Sperry & Hutchinson Green Stamp Division, that the Option Trading Wire information service had rated the potential return on the stock as "very good," and that on March 8, the day before he recommended it, the stock had hit a new high and was "trending upwards."

The day after McDonald purchased the stock at 35¾, its value fell. According to Dodson, McDonald suggested that Dodson purchase more common stock and call options in order to obtain a lower average price. Additional Baldwin–United stock was purchased on that second day. As the stock's price continued to decline during the last part of March, Dodson and McDonald had several discussions, and Dodson testified that on at least two occasions he suggested that one alternative might be for McDonald to sell the stock and take the loss. McDonald testified that, after the stock had fallen to 21, Dodson said, "Fred, you have confidence in me, remember there

---

**5.** The prospectus of the Options Clearing Corporation provided, in relevant part:

An investor should not purchase an Option unless he is able to sustain a total loss of the premium and transaction costs of purchasing the Option, and should not write an Option unless he is able to sustain substantial financial losses, or unless, in the case of a Call, he owns the underlying security....
Certain Risk Factors....
1. The purchaser of a Put or a Call runs the risk of losing his entire investment in a relatively short period of time.
Options Clearing Corporation Prospectus, at 1, 6.

**6.** Prior to the decline in stock values in McDonald's account in 1983, the account suffered a devaluation of about 50% in late 1981. According to McDonald, Dodson responded to his expressions of concern with reassurances which later turned out to be well-founded: "'So Fred,' he said, 'trust me, I know these stocks, I researched them, they're going to be good, they're going to go up; a lot of these stocks have gone through bad times, but they have come back, you can trust me, this will come up.' And they did come back in about, I think, four, five months, they were right up again.... Right up to where they were. And I had unbounded confidence in Bill, because he called the shots exactly right." R. 6:81.

have been other times things looked bad and came back." R.6:82. When the stock fell to 14, McDonald testified, Dodson advised, "Fred, listen to me, Baldwin's portfolio is our stock-in-trade, consists of about the biggest, soundest asset that the human mind has devised.... [A]ll the stockholders who bought when it was way up around thirty-five, will recover every penny they have lost, because there are companies, big insurance companies.... And they're going to get this, because this is money in the bank, the greatest thing going, so don't worry about it." R.6:82–83. Finally, on August 4, 1983, McDonald sold the stock at 7½.

Plaintiffs' expert, Henry Crowell Murfey, testified with respect to Baldwin–United that, "from a fundamental point of view, historically, the stock had been very successful in terms of producing a rise in earnings." R.9:560. Murfey opined that the stock could not have been recommended for two of McDonald's expressed objectives, income and growth. And with respect to McDonald's third goal, the "stock for trading purposes could not have been recommended as a top choice at the time it was recommended." R.9:577. "[O]n the very day it was bought," Murfey testified, "there was not strong evidence to buy the [Baldwin–United] stock.... [A]t the time of the second purchase [March 17, 1983] there was even stronger evidence that one should not buy Baldwin–United for trading profits.... It was unreasonable to recommend Baldwin–United, especially at the time of the second transaction for purchase." R.9:566–67. Murfey testified that certain adverse developments with respect to Baldwin–United were reported prior to the time of Dodson's recommendation. On October 26, 1982, an article in *The Wall Street Journal* reported that an Arkansas regulatory body had found a Baldwin–United national investors pension insurance company unit short of acceptable asset levels during 1982. On December 20, 1982, *The Wall Street Journal* reported that a Merrill Lynch securities analyst had lowered the Baldwin–United stock ratings. On January 24, 1983, Murfey testified, it was reported that certain securities dealers, including Prudential Bache and Smith Barney, had ceased acting as sales agents for the insurance product of this Baldwin–United subsidiary. Finally, during the final quarter of 1982, Baldwin–United showed a loss of seven cents per share. However, on cross-examination, Murfey acknowledged that, at the time the Baldwin–United position was established, "one could reasonably at that time expect a neutral to bullish situation, with emphasis on the neutral. Because there had not yet developed all of the elements of the downtrends which would be indicative, that it [the recommendation to purchase] would be inappropriate." R. 9:627.

### Storage Technology

On February 4, 1983, Dodson recommended that McDonald purchase 500 shares of common stock in Storage Technology. McDonald testified that Dodson praised Storage Technology and enthusiastically recommended it. Dodson testified that the basis for his initial recommendation of this stock was that both the California Technology Letter and Market Logic, two stock research publications, recommended it highly, listing the stock in their respective model portfolios; and that Storage Technology was recommended by the Options Trading Wire and was given a B+ rating by Standard & Poors.

According to Dodson, McDonald made one to two thousand dollars on the first several transactions involving Storage Technology stock. However, the stock price fell precipitously in the second half of 1983 and 1984. From McDonald's first purchase on February 11, 1983 at 22⅞, the price fell to 10⅛ by May 22, 1984, when McDonald sold his last shares of the stock. Dodson testified that both he and his mother owned the stock and that he lost $35,000 when the stock price fell. In December, 1983, after the stock price had been falling for some time, Dodson testified that he "didn't do anything.... I really believed in the stock." R.7:302. Plaintiffs' expert, Murfey, testified that Storage Technology had an upward investment trend and that there was a reasonable basis to recommend

the stock for at least one of McDonald's stated investment goals. McDonald testified that he lost $35,000 on Storage Technology by December 1983.

With respect to Storage Technology, Murfey advised that "one would have questioned the wisdom of buying the stock, because of adverse fundamental changes in the company." R.8:553. Still, Murfey conceded that, when Dodson recommended purchase of Storage Technology in February, 1983, there was a reasonable basis for the recommendation, "[s]o long as one would trade that stock using a strategy using overall price future...." R.9:623. Murfey testified that "certain" of the Storage Technology transactions "were thoroughly reasonable at the time they were recommended and put into place." R.9:600. From May 1983 on, however, Murfey concluded that Storage Technology stock could not meet the goals of growth, income or trading profits. Murfey testified that the bases for his conclusions regarding Storage Technology were that the stock paid no dividends, the earnings per share began declining during the three-month period ending September 30, 1982 and continued at least through June 1984, and that after May 1983 the stock price was "decisively downward, and the trends became worse...." R.9:570. Furthermore, on November 1, 1982, *The Wall Street Journal* reported that the company had projected a decline in profits and had cut its workforce in the United States by 400.

## Mitel

On November 11, 1982 Dodson recommended that McDonald purchase stock in Mitel Corporation. According to McDonald, Dodson was "very, very lavish in his praise of Mitel," and said that it was a "wonderful" stock. R.7:201. Mitel's value fell more sharply than that of Storage Technology, from 27⅜ on January 17, 1983,

to 7⅛, when McDonald sold his remaining shares on April 14, 1984. Dodson testified that his recommendation of Mitel was based on the stock's appearance on the Options Trading Wire as a recommended trade, and its recommendation until the spring of 1984 by Dean Witter Reynolds. According to Dodson, McDonald made $9500 during the first year of trading in Mitel. Plaintiffs' expert testified that Mitel "was a reasonable recommendation for certain uses." R.9:622.

Murfey testified that, at the time of Dodson's recommendation of Mitel in late 1982, the stock, while "unsuitable as a reasonable recommendation for income at that time, ... was a reasonable recommendation for long term growth.... And with respect to trading profits, one would, because of the uptrend, with respect to all the trends, look at this stock as a first choice at that time, for engaging in bullish trading of it." R.9:579. Following January 10, 1983, when *The Wall Street Journal* reported a break in these positive trends, "[o]ne would avoid recommendation for long-term growth, and mid-January forward orientation toward trading profits would have to be a bearish one, unless the stock by trading strength showed it was suitable or reasonable to put money into it in related securities, in expectation of higher prices." R.9:581. On April 26, 1983, *The Wall Street Journal* reported that Mitel had, in the three months ending February 25, 1983, suffered its first decline in yearly earnings in five or six years.

## II.  DISCUSSION

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance." 15 U.S.C.A. § 78j(b).[7] Rule 10b–5,

---

7. Section 10(b) provides:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

   b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in

promulgated by the Securities Exchange Commission pursuant to Section 10(b), prohibits any "artifice to defraud" or any act which "operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b–5.[8] A successful cause of action under Section 10(b) or Rule 10b–5 requires that the plaintiff prove (1) a misstatement or omission (2) of a material fact (3) made with scienter (4) upon which the plaintiff relied (5) that proximately caused the plaintiff's loss. *Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1046 (11th Cir.1987). The Supreme Court has expressly left open the question of whether scienter includes, not only intent, but also recklessness. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976) ("We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5"); *see also Aaron v. SEC,* 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 1950 n. 5, 64 L.Ed.2d 611 (1980) (declining to address the question reserved in *Hochfelder* in the context of SEC enforcement proceedings). However, the rule of this Circuit is that a showing of "severe recklessness" satisfies the scienter requirement. *See Woods v. Barnett Bank of Fort Lauderdale,* 765 F.2d 1004, 1010 (11th Cir.1985); *White v. Sanders,* 689 F.2d 1366, 1367 n. 4 (11th Cir.1982); *Broad v. Rockwell International Corp.,* 642 F.2d 929, 961 (5th Cir.) (en banc), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981); *G.A. Thompson & Co., Inc. v. Partridge,* 636 F.2d 945, 961 (5th Cir.1981).[9] "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Broad,* 642 F.2d at 961–62. *See Huddleston v. Herman & MacLean,* 640 F.2d 534, 545 (5th Cir. Unit A 1981), *modified on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) (approving jury instruction that scienter could be established by proof of "conduct which is so extreme as to be a form of intentional conduct or behavior equivalent to an intent to deceive, manipulate or defraud").[10]

the public interest or for the protection of investors.
15 U.S.C. § 78j.

**8.** Rule 10b–5 provides:
Employment of manipulative and deceptive devices.
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

**9.** Appellants cite to *Canizaro v. Kohlmeyer & Company,* 370 F.Supp. 282 (E.D.La.1974), *affd. on other grounds,* 512 F.2d 484 (5th Cir.1975), for the proposition that, when a broker solicits or recommends the purchase of a security, the broker must have a reasonable basis for what he tells his customer. The discussion in *Canizaro* regarding a requirement that there be a reasonable basis for a recommendation was dictum. Furthermore, *Canizaro* was decided prior to the Supreme Court's holding in *Hochfelder, supra,* that scienter is a requisite element of any action for damages under § 10(b) and Rule 10b–5.

*Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042 (11th Cir.1987), cited by appellants for the proposition that defendants owed them a series of duties which were breached, set forth the duties listed as common law fiduciary obligations, not duties owed under the federal securities laws. 810 F.2d at 1048–51. *Gochnauer* held only that a broker could fail to violate federal securities anti-fraud provisions and still be liable under state common law for breach of fiduciary obligations.

**10.** The Ninth Circuit and the Seventh Circuit have both held that, "Rather than being 'merely a greater degree of ordinary negligence,' recklessness is closer to 'a lesser form of intent.'" *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.,* 739 F.2d 1434, 1435 (9th Cir.1984) (citations omitted). *See Sanders v. John Nuveen & Co.,* 554 F.2d 790, 793 (7th Cir.1977).

■ The Court made clear in *Hochfelder, supra,* that "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." 96 S.Ct. at 1381 n. 12. Appellants have offered no statement made by appellees which approaches this level of culpability, i.e., either intent or recklessness. Plaintiffs' expert, Henry Crowell Murfey, concluded that the three securities at issue "did not at the time the transactions were effected in them, have a reasonable basis for achieving Mr. McDonald's expressed investment goals.... [They were] Baldwin–United; Mitel Corporation, 1983 onward; and Storage Technology, I believe from May of '83 onward." R.8:548. Yet, unreasonableness does not meet the standard for scienter.

Taking the evidence in the light most favorable to plaintiff, we cannot conclude that McDonald has adduced sufficient evidence to satisfy the scienter requirement of recklessness. At most, McDonald has established that some of Dodson's recommendations were merely not appropriate or reasonable. Proving merely poor advice may establish negligence, but it clearly falls short of demonstrating recklessness.[11]

### III. CONCLUSION

Appellants have made no showing that Dodson's alleged statements and omissions represented an extreme departure from the standards of ordinary care and presented a danger of misleading appellants which was either known to appellees or was so obvious that they must have been aware of it. Accordingly, they have failed to demonstrate that appellees acted with scienter.

AFFIRMED.

---

**11.** This is not a case in which the investor was inexperienced or options strategies were inappropriate.