[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 20, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-11803

_____

D.C. Docket No. 02-00258-CV-4


TSG WATER RESOURCES, INC. (TSG),
TSG TECHNOLOGIES, INC., et al.,

                                        Plaintiffs-
                                        Counter-Defendants
                                        Appellants,

                        versus


D'ALBA & DONOVAN CERTIFIED
PUBLIC ACCOUNTANTS, P.C.

                                        Defendant-
                                        Counter-Claimant
                                        Appellee,


MORRIS BENCINI,

                                        Defendant-Appellee.



_____

Appeal from the United States District Court
for the Southern District of Georgia

_____


**(December 20, 2007)**

Before CARNES and BARKETT, Circuit Judges, and COHN,[*] District Judge.

PER CURIAM:

This appeal was brought following entry of final judgment against Plaintiffs TSG Water Resources, Inc., et al. After considering the issues on appeal, we reverse in part, affirm in part, and remand the case for further proceedings.

## I.      Background

TSG Tech, a wholly owned subsidiary of TSG Water, is a company that builds and sometimes operates water treatment facilities. The issues in this case relate to the preparation and auditing of TSG Tech's financial statements for the year 2000 and subsequent actions taken by its board members and other investors allegedly in reliance on those statements.

As of the year 2000, TSG Tech was being run by president James Walker, who is not a party to this action, and a small number of officers. Appellee Morris Bencini was hired as the Chief Financial Officer of the company in 1999, and was responsible for preparing monthly and quarterly financial statements for the company's management, board of directors, and investors, including the financial statements for the year 2000, as well as attending meetings of the board of

---

[*] The Honorable James I. Cohn, United States District Judge for the Southern District of Florida, sitting by designation.

directors and answering questions about financial matters. Bencini was also responsible for any attempts to acquire or merge with other companies, including arranging financing for these acquisitions or mergers. Appellee D'Alba & Donovan Certified Public Accountants, P.C. ("D&D") was hired to conduct an audit of the year 2000 financial statements.

Due to a number of accounting errors, discussed in greater detail below, the financial statements for the year 2000 significantly overstated the financial health of the company and incorrectly indicated that it had turned a profit for the first time in its history. The company's cash flow situation reached a crisis point in June 2001, and the board of directors was forced to decide whether to let the company fail or to invest more capital. Believing the cash flow problems to be short-term in nature, allegedly because of the positive outcome in the previous year represented in the financial statements, several members of the board of directors invested money themselves, and solicited outside investments from friends and family members totaling over $1.45 million. When the accounting errors were later discovered, and the true financial state of the company revealed, the board of directors took steps to dilute Walker's majority interest and remove him as president.

## II. Procedural History

3

The case was originally filed in federal court, but was voluntarily dismissed and re-filed in state court. The Complaint alleged claims of breach of fiduciary duty, fraud, securities fraud, and breach of contract against both D&D and Bencini. In addition, the Complaint alleged claims of professional negligence, ordinary/gross negligence, and negligent retention and supervision against D&D. Defendants D&D and Bencini removed the case to the United States District Court for the Southern District of Georgia, asserting diversity jurisdiction. The District Court denied Appellants' Motion to Remand, finding that TSG Tech was a resident of Georgia for purposes of diversity jurisdiction.

Appellees each filed separate Motions for Summary Judgment. The District Court issued an Order before the trial granting Bencini's Motion in its entirety and D&D's Motion in part, leaving only the claims against D&D of professional negligence, ordinary and/or gross negligence, and breach of contract for trial. Following the trial, the jury reached a verdict in favor of TSG in the total amount of $317,000, less 10% for contributory negligence. However, upon a renewed Motion for Judgment as a Matter of Law, the District Court found that the exculpatory language contained in the engagement letter was valid and barred TSG's remaining claims, and the Court entered final judgment in favor of D&D. Appellants then filed the instant appeal.

4

## III.   Jurisdiction of the District Court

On appeal to this Court, Appellants first contend that the District Court lacked jurisdiction over the case and should not have denied their Motion to Remand. The District Court found that Georgia was TSG Tech's principal place of business and state of incorporation, and denied the Motion to Remand. Appellants contend on appeal that TSG Tech's principal place of business is Florida. Thus, Appellants argue, because Bencini is also a resident of Florida, there was no complete diversity, and the District Court erred in denying the Motion to Remand.

We review rulings on the subject-matter jurisdiction of the District Court *de novo*. MacGinnitie v. Hobbs Group, 420 F.3d 1234, 1239 (11th Cir. 2005); Williams v. Best Buy Co., 269 F.3d 1316, 1317 (11th Cir. 2001). A clearly erroneous standard of review is not applied to findings of fact that are premised upon an erroneous view of controlling legal principles. Johnson v. Uncle Ben's, 628 F.2d 419, 422 (5th Cir. 1980). The District Court's factual findings regarding a company's principal place of business, however, are subject to a clearly erroneous standard of review. Id.; Vill. Fair Shopping Ctr Co. v. Sam Broadhead Trust, 588 F.2d 431, 434 (5th Cir. 1979). We examine the subject matter jurisdiction of the trial court as a threshold matter before considering the merits of

the appeal.  <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94 (1998).

Complete diversity requires that no defendant in a diversity action be a citizen of the same state as any plaintiff.  28 U.S.C. § 1332; <u>Carden v. Arkoma Assocs.</u>, 494 U.S. 185, 187 (1990).  For purposes of diversity jurisdiction, a corporation is a citizen of both the state in which it is incorporated and the state in which it has its principal place of business.  28 U.S.C. § 1332(c).  The legal standard used in this Circuit to determine a company's principal place of business for purposes of diversity jurisdiction is the "total activities" test.  <u>MacGinnitie</u>, 420 F.3d at 1239; <u>Toms v. Country Quality Meats, Inc.</u>, 610 F.2d 313, 315 (5th Cir. 1980).  The "total activities test" is a combination of the "place of activities" test and the "nerve center" test used in other circuits.  <u>MacGinnitie</u>, 420 F.3d at 1239.  Under the "place of activities" test, the location where most of the company's sales or production takes place is typically determined to be its principal place of business.  <u>Id.</u>  Under the "nerve center" test, the location of the company's corporate offices is usually determined to be its principal place of business.  <u>Id.</u>  When the results of these two tests differ, under the "total activities" test, the district court must conduct a "somewhat subjective analysis" to choose between the two results.  <u>Id.</u>  Eleventh Circuit cases have held that where a company's activities are not concentrated in one place, a district court may place

6

greater emphasis on the "nerve center" test when determining principal place of business. MacGinnitie, 420 F.3d at 1239 (*interpreting* Sweet Pea Marine, Ltd. v. APJ Marine, Inc., 411 F.3d 1242, 1248 (11th Cir. 2005)).

Appellants argue that the District Court placed inappropriate weight on the "nerve center" factors because the physical activities of the company were concentrated in Florida, not diffused throughout the Caribbean as the District Court concluded. Upon review of the District Court's Order, it appears that the Court considered all the facts and made adequate findings to support its ruling. In reciting the facts of the case, the Court stated that "on any given project, TSG Tech does all of its design and engineering, much of its purchasing and most of its fabrication in Gainesville [Florida]." (Order Denying Remand, p. 5.) However, the Court also noted that "many of the water and waste water treatment plants that TSG Tech operates are in the Caribbean" and "in 2002, most of TSG Tech's revenue came from work in the Caribbean." (Id. at 3.) Ultimately, the Court found that "while TSG Tech comes into contact with the public in Florida, many of the daily activities of TSG Tech occur in Florida, and TSG Tech maintains its tangible assets in Florida, the activity which occurs in Georgia is more significant." (Id. at 7.) Thus, the District Court clearly articulated its finding that many of TSG Tech's activities, though not a majority of them, were carried on in

7

Florida. In light of the holding in <u>MacGinnitie</u>, this finding by the District Court is adequate to support the conclusion that the "nerve center" factors should have greater weight in the determination of the principal place of business.

Furthermore, the record before the District Court contained substantial evidence of TSG's activities in Georgia that supports the Court's ruling. TSG Tech's corporate records, banking records, accounting records, and original contracts are maintained at the Savannah, Georgia headquarters of its parent company, TSG Water. TSG Water directs the activities of TSG Tech and other subsidiaries from the Georgia headquarters. The decision-makers for TSG Tech, including its directors and two of its officers, are also located in Georgia. Only one of the four officers is located in Florida, and the TSG Tech board of directors has never met in Florida. The payroll, insurance, and accounts payable for TSG Tech are controlled and directed by the Georgia office, which also prepares financial statements and invoices. The accounting and legal professionals used by TSG Tech are also located in Georgia. Additionally, TSG Tech's primary operating bank account is located in Georgia, and all the signatories to the account are persons located in Georgia. On this record, and with greater emphasis properly placed on the "nerve center" factors pursuant to <u>MacGinnitie</u>, the District Court's finding that TSG Tech's principal place of business was in Georgia is not clearly

8

erroneous. Thus, the District Court's denial of the Motion to Remand is affirmed.

## IV. Summary Judgment

Appellants also appeal the District Court's grant of summary judgment in favor of Appellee Bencini on the breach of fiduciary duty claim and in favor of Appellees Bencini and D&D on the fraud, securities fraud, and negligence claims. We review *de novo* the District Court's grant of summary judgment, and apply the same legal standard as the District Court. Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999). The District Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The District Court granted summary judgment in favor of Appellee Bencini on the breach of fiduciary duty claim, basing its ruling on the business judgment rule, and granted summary judgment in favor of Appellees Bencini and D&D on the fraud, securities fraud, and negligence claims.

### A. Business Judgment Rule and the Breach of Fiduciary Duty Claim

In granting summary judgment in favor of Bencini on the breach of fiduciary duty claim, the District Court concluded that Bencini was protected by

9

the business judgment rule. Appellants contend, on appeal, that a genuine issue of material fact exists as to whether Bencini acted fraudulently, in bad faith, or in an abuse of his discretion. "The business judgment rule protects directors and officers from liability when they make good faith business decisions in an informed and deliberate manner." In re Munford, Inc., 98 F.3d 604, 611 (11th Cir. 1996). The presumption is that they have acted "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." Cottle v. Storer Commc'n, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Unless this presumption is rebutted, they cannot be held personally liable for managerial decisions. Stepak ex rel. Southern Co. v. Addison, 20 F.3d 398, 403 (11th Cir. 1994). However, officers may be held liable where they engage in fraud, bad faith, or an abuse of discretion. Cottle, 849 F.2d at 574. To survive a motion for summary judgment, a plaintiff "must allege specific facts that show a genuine issue of material fact concerning fraud, bad faith or abuse of discretion." Id. at 575.

The core of Plaintiffs' claims against Bencini are the accounting errors he made in preparing the financial statements and his failure to advise the board of directors about those errors. Throughout the year 2000, Bencini provided financial statements to management that showed the company was earning a profit.

The consolidated financial statements for the entire year 2000 showed a profit of over $38,000, making it the first year in which the company had ever shown a year-end profit. Bencini engaged Appellee D&D to conduct an audit of these year-end financial statements, and on April 27, 2001, D&D issued its report that the company had earned an even greater profit of $68,926. Based on this information, the board and management concluded that TSG Tech had "turned a corner" financially.

Subsequent review, however, revealed that a number of accounting errors contained in the year-end reports resulted in a major over-statement of the company's financial well-being. These included:

1. Failure to follow percentage of completion rule, resulting in the entire projected profit for the Burnt Store project being included in a single year;

2. Booking of a deferred tax asset without adequate evidence that the company would likely be profitable in the near future, as required;

3. Improperly allowing capitalization of marketing costs;

4. Failing to account for the company's liability for 401(k) contributions;

11

5. Capitalizing costs for development of vessel prototypes despite the fact that the prototypes underwent destructive testing and, thus, could not be added to inventory;

6. Failing to account for a tax liability to the United States Virgin Islands.

By May 2001, Bencini discovered that TSG was experiencing a cash flow problem, and reexamined the accounting for the previous year. He discussed the accounting errors with personnel at D&D, and informed TSG Tech's president, James Walker, of the impending cash flow problem, but did not warn the board of directors or any investors. The annual meeting of directors and shareholders was held on May 22, 2001, at which Walker told the attendees that the company had "turned the corner" financially after becoming profitable for the first time in 2000. Bencini remained silent at this meeting.

In early June 2001, the threat of a lien on the Burnt Store project forced the directors to make prompt decisions regarding whether to invest additional capital. The board of directors convened a meeting at which Bencini was not present. At this meeting, Walker provided explanations for the cash shortfall, and presented the directors with a cash flow spreadsheet that Bencini had prepared showing that the company could break even that year if it obtained certain projects and the

12

proposed investments were made. The spreadsheets also showed monthly overhead expenses totaling $250,000, which Appellants allege is actually understated by approximately $80,000 per month. Several of the board members and other investors invested varying amounts of money totaling over $1.45 million in June and July 2001.

The District Court concluded that the business judgment rule protected Bencini's discretionary decisions regarding the accounting treatment applied to accurate core financial data in the year 2000 statements. The Court noted that no allegations of self-dealing on the part of Bencini had been made, and concluded that Bencini had discharged his duty to act in an informed and deliberate manner, as required by the business judgment rule, by relying on outside accounting experts. However, consulting with outside experts alone is not enough to satisfy the requirements of the business judgment rule. The cases cited by the District Court, and by Appellees in their briefs, stand only for the proposition that such consultation weighs in favor of a finding that the officer did not act in bad faith or abuse his discretion. In Munford, the court stated that "in this case, the record is replete with evidence that the directors and officers consulted legal and financial experts throughout the solicitation and negotiation for a purchaser for Munford, Inc.," and concludes that applying the business judgment rule, the directors

13

satisfied their duties. Munford, 98 F.3d at 611. The Munford court considered the totality of the facts in the case, not just the fact that the directors consulted with outside professionals, and the holding of the case is not based solely on the consultation. Similarly, in Cottle, the court reasoned that "the fact that the board did consult [an outside financial advisor] simply weighs in favor of finding that the directors did not abuse their discretion." 849 F.2d at 578. The simple fact that Bencini consulted with D&D is, therefore, not determinative.

Furthermore, the allegations and evidence in this case do create a disputed issue of material fact as to whether Bencini acted fraudulently, in bad faith, or in an abuse of his discretion. Contrary to the District Court's statement that no allegations of self-dealing had been made, Appellants have presented evidence that could indicate collusion between Bencini and D&D, including Bencini's prior relationships with individual accountants at D&D. Appellants have also presented evidence indicating that Bencini had much to gain from misrepresenting the financial health of the company. Even if Bencini did not act in bad faith, a genuine issue of material fact exists as to whether he abused his discretion in applying the incorrect accounting treatment and then not informing the board of directors of the error. The record shows that Bencini was aware of the inaccuracies sometime in May 2001, but he remained silent at a board meeting on

14

May 22, 2001. Although he left the company on short notice soon after this meeting, Bencini also prepared cash flow spreadsheets that were used specifically for the purpose of facilitating the board's decision regarding the company's cash flow crisis, and these spreadsheets allegedly understated overhead costs by approximately $80,000 per month. These facts, at a minimum, demonstrate a genuine issue of material fact as to whether Bencini acted in bad faith or abused his discretion and are sufficient to defeat a motion for summary judgment. Therefore, the District Court's grant of summary judgment to Appellee Bencini on the breach of fiduciary duty claim is reversed.

### B. Fraud and Securities Fraud Claims

The District Court also granted summary judgment in favor of both Bencini and D&D on the fraud and securities fraud claims, concluding that there was inadequate evidence in the record to support findings of proximate cause, justifiable reliance, or intent. Appellants appeal this Order, arguing that the record contained genuine issues of material fact regarding these issues.

The tort of fraud has five elements: (1) false representation by a defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting in reliance upon the representation; (4) justifiable reliance by the plaintiff upon the representation; and (5) damage to the plaintiff directly and proximately caused by

15

the reliance.  <u>Middleton v. Troy Young Realty, Inc.</u>, 572 S.E.2d 334, 336 (Ga. Ct. App. 2002).

Securities fraud under Georgia law also has five elements:  (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which the plaintiff relied, (5) that proximately caused his injury.  <u>GCA Strategic Inv. Fund v. Joseph Charles & Assocs.</u>, 537 S.E.2d 677, 682 (Ga. Ct. App. 2000).  "Misrepresentations are not actionable unless the complaining party was justified in relying thereon in the exercise of common prudence and diligence."  <u>Id.</u>

### 1.    *Proximate Cause*

Proximate cause is ordinarily a factual determination to be made by the jury, but "plain and indisputable cases may be decided by the court as a matter of law." <u>Thomas v. Food Lion, LLC</u>, 570 S.E.2d 18, 21 (Ga. Ct. App. 2002).  In determining whether or not summary judgment is appropriate, courts must consider "whether the causal connection between the defendant's conduct and the injury is too remote for the law to countenance a recovery."  <u>Id.</u>  The District Court in this case concluded that "this is one of those plain and indisputable cases" where no reasonable jury could find proximate cause.  The Court's analysis focused on the company's major financial problems, which were known to the plaintiff investors before they chose to make major "last ditch effort" loans to save

the company. The Court reasoned that the cause of the investors' injuries was the combination of the company's extremely high expenses, lack of major income generation, and poor management by Walker, not any misrepresentations made by Bencini.

Although Walker's poor management and the company's high operating expenses certainly caused the company to reach a crisis point in June 2001, it is the subsequent decisions of the board members and investors, in reliance on Bencini's representations, and the following consequences that form the basis of the Complaint in this action. Appellants do not argue that the company would not have faced a financial crisis absent the alleged misrepresentations, they argue that the crisis would have been addressed differently and more effectively had they been given accurate financial statements. The record contains testimony from TSG's directors that had they known the 2000 financial statements were incorrect, they would have done in the summer of 2001 what they actually did do later in the year when they discovered the errors: take control from Walker, fire him, and cut payroll and expenses to save the company money. Furthermore, the year-end profit shown in the erroneous accounting statements for the year 2000 provided strong evidence to the board that the basic business model of the company was a good one, and that any financial problems were temporary in nature. The

individual investors testified that their decisions to invest further in the company would have been very different had they known that the financial statements were inaccurate and that the business model was not, in fact, working.

The District Court characterized the board members' testimony as a mere "belief" that Walker would have lost control of the company earlier than he did, and stressed that evidence showing that an affiant "believes" something to be true is insufficient to defeat summary judgment. See Pace v. Capobianco, 283 F.3d 1275, 1278-79 (11th Cir. 2002). However, in light of the evidence that the board did, in fact, remove Walker later in 2001, once the errors were discovered, it is difficult to see how this testimony can be considered to be a mere "belief." Given this evidence in the record, we cannot agree with the District Court that it is "plain and indisputable" that proximate causation could not have been established.

### 2. *Justifiable Reliance*

Claims for both fraud and securities fraud require a finding of justifiable reliance under Georgia law. To show justifiable reliance on the misrepresented information in support of a securities fraud claim, a plaintiff "must show that 'with the exercise of reasonable diligence [it] still could not have discovered the truth behind the fraudulent omission or misrepresentation.'" GCA Strategic Inv. Fund, 537 S.E.2d at 464. To show justifiable reliance to support a common law fraud

claim, a plaintiff must "prove that it exercised due care to discover the fraud." Id. The fundamental principle on this issue is that "misrepresentations are not actionable unless the complaining party was justified in relying thereon in the exercise of common prudence and diligence." Id. "While questions of due diligence often must be resolved by the trier of fact, that is not always the case. One may fail to exercise due diligence as a matter of law." Fowler v. Overby, 478 S.E.2d 919, 921 (Ga. Ct. App. 1996).

The District Court concluded that the investor plaintiffs, both those from within the company's board of directors and the outside investors,[1] could not show justifiable reliance as a matter of law. In reaching this conclusion, the Court considered a Georgia Court of Appeals case that explained that "an investment decision based solely or primarily on an accountant's audit report would be, in most cases, difficult to justify." White v. BDO Seidman, LLP, 549 S.E.2d 490, 494 (Ga. Ct. App. 2001). The Court considered the evidence that the inside investors were present at the June 2001 meeting and knew the dire financial situation of the company. The Court concluded that, at a minimum, the negative

---

[1] We, like the District Court, differentiate between "inside" and "outside" investors. The "inside" investors are Directors of the company who also invested – Donald Mayer, Paul Steward, and Jonathan Sprague. The "outside" investors are friends and family members of Mayer who invested but were not otherwise involved with the company – Robert Bolz, John Bolz, William Holden, and OGM Family Limited Partnership.

19

information about the company's financial health should have put the inside investors on notice that they should "further explore the financial health of TSG before making any more investments in the company." (Order Granting Summary Judgment, p. 18.)

Based on White, we agree with the District Court that the investors cannot maintain the fraud claims against D&D because they were not justified in relying solely on D&D's audit report. However, we cannot reach the same conclusion with respect to the claims against Bencini. Unlike the situation presented in White, these investors did not rely solely on the financial statements in deciding to make their investments. These investors testified that they considered all the financial information presented to them, and relied on the financial statements for the purpose of evaluating whether the company was fundamentally "broken" or the cash crisis was merely a short-term problem that could and should be remedied with further investments. To that end, they looked to the 2000 financial statements and relied upon them to the extent that they established that the company had shown a profit in the recent past. Their reliance on the financial statements as an accurate representation of the financial health of the company in 2000 was even more justifiable in light of the representations made by Walker at the May 2001 board meeting that the company had "turned the corner," to which

20

Bencini did not object. In sum, the inside investors testified that they relied on the 2000 financial statements to gauge the severity of the crisis that arose in the summer of 2001and to make decisions about how to address that crisis. In a footnote, the Court noted that it "finds unpersuasive Plaintiffs' attempts to characterize TSG's June 2001 severe cash flow problem as a short-term cash shortfall." (Order, p. 17.) This statement, however, appears to be a simple factual determination that the Court may not make at the summary judgment stage, where the facts must be construed in favor of the non-moving party. Given the evidence in the record, there appears to have been a genuine issue of material fact regarding justifiable reliance, and summary judgment on this basis was improper as to the claims against Bencini.

The outside investors, however, are in a distinctly different position from the inside investors who actually reviewed and relied upon the financial statements. The District Court concluded that the outside investors did not reasonably rely on the 2000 financial statements. The evidence in the record is not disputed on this point, and shows that these outside investors did not rely on any financial statements, but rather relied on the representations of Mayer, one of the inside investors who was privy to the information as discussed above. This type of "indirect reliance" was clearly rejected in White, where the Georgia Court of

Appeals held that Georgia law does not permit indirect reliance to substitute for proof of actual reliance. 549 S.E. at 493. Accordingly, we affirm the District Court's entry of summary judgment on the fraud claims as to the outside investors.

### 3. *Intent*

To prove a claim for fraud, a plaintiff must show intent to mislead. "A misrepresentation is intended to deceive where there is intent that the representation be acted upon by the other party." Petzelt v. Tewes, 581 S.E.2d 345, 347 (Ga. Ct. App. 2003). Proof of fraud is typically not susceptible of direct proof, and so circumstantial evidence must be used to establish fraudulent intent. Id. Thus, "it is peculiarly the province of the jury to pass on these circumstances showing fraud. Except in plain and indisputable cases, scienter in actions based on fraud is an issue of fact for jury determination." Id.

The District Court concluded that "there is no evidence to support the claim that Bencini and D&D knew that the Financial Statements would be used in connection with an offer to sell securities in TSG or that the Investor Plaintiffs would be solicited for investment capital." (Order Granting Summary Judgment, p. 21.) Contrary to Appellants' arguments, a showing of recklessness under a theory of constructive fraud does not provide an alternate theory on which Appellants' common law fraud claim may be based. Constructive fraud is "not

22

creative of any independent right of action for damages in tort in favor of the injured party; but [the misrepresentations] may support an action in equity to rescind a contract so induced." Penn Mut. Life Ins. Co. v. Taggart, 144 S.E. 400, 402 (Ga. Ct. App. 1928). Because Appellants seek to recover money damages in this action, this theory is inapplicable, and Appellants may not satisfy the intent element of their fraud claim with evidence of recklessness.

However, a showing of severe recklessness is adequate to support Appellants' claims for securities fraud. Although common law fraud in Georgia requires a showing that the misrepresentations were made with the intention and purpose of deceiving the plaintiff, securities fraud under Georgia law requires only that plaintiffs show that the representations were made with scienter. The United States Supreme Court has left open the question of whether scienter in the context of securities fraud can consist of not only intent, but also recklessness. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). The Eleventh Circuit, however, has concluded that a showing of "severe recklessness" can satisfy the scienter requirement in a securities fraud case. McDonald v. Alan Bush Brokerage Co., 863 F.2d 809, 814 (11th Cir. 1989).[2] Thus, the District Court's blanket

_____

[2] Although Ernst & Ernst and McDonald both involve federal claims for securities fraud, they are instructive here. "[T]o evaluate a claim for securities fraud under [Georgia statutory law], we look to the similar elements a plaintiff must allege under section 10(b) of the Securities

23

finding that the record contained no evidence to show that D&D and Bencini actually intended to deceive the investors fails to differentiate between the two materially different state of mind standards in claims for fraud and claims for securities fraud. In addition to actual intent, severe recklessness would also be adequate to satisfy the scienter requirement in a claim for securities fraud. "'Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" McDonald, 863 F.2d at 814 (*quoting* Broad v. Rockwell Int'l Corp., 642 F.2d 929, 961-62 (5th Cir. 1981)).

We must now consider whether adequate evidence existed in the record to create a genuine issue of material fact as to the intent requirement for Appellants' fraud claim and the scienter requirement for Appellants' securities fraud claim. Appellants argue that the sheer magnitude, number, and nature of the errors could give rise to a reasonable inference that Bencini intended to conceal the true financial condition of the company and mislead them. They also point to an email

Act of 1934." GCA Strategic Inv. Fund, 537 S.E.2d at 682.

from Bencini to an accountant at D&D wherein he advises D&D that TSG was attempting to acquire other businesses and would need as much as $50 million to complete these desired acquisitions, of which $3 million to $10 million could be raised through the sale of stock. This email indicates that as of February 2000, when the email was sent, both Bencini and D&D were aware that significant efforts to obtain capital would be forthcoming, and this evidence could also support an inference that they intended to manipulate the accounting figures to appeal to potential investors. The record in this case also shows that capital had been raised from investments by the directors in the past, and so a jury could also infer from this that D&D and Bencini knew the directors could be called upon to invest again in the future. Although these pieces of evidence, taken individually, may not provide adequate evidentiary support on the element of intent, taken together they could support a reasonable inference by a jury that Bencini intended to mislead investors. At the very least, this evidence could support a finding that Bencini's errors and subsequent failure to correct the board members' impression of the company's financial health constituted severe recklessness. On this record, we conclude that adequate evidence existed to preclude summary judgment on the element of intent as to both the common law fraud and securities fraud claims.

## V.    Judgment as a Matter of Law Based on Exculpatory Clause

Appellants also argue that the District Court erred in granting judgment as a matter of law in favor of D&D on the claims of professional negligence, ordinary and/or gross negligence, and breach of contract following the trial. The Court based its decision on the exculpatory language contained in D&D's engagement letter, concluding that this language barred the claims raised against D&D as a matter of law. The language on which the Court relied states that D&D is released from liability for any consequential, indirect, lost profit, or similar damages relating to D&D's services, except where those damages were the result of willful misconduct or fraud. (Order Granting D&D's Renewed Motion for Judgment as a Matter of Law, p. 2.) Because the Court had previously entered summary judgment in favor of D&D on the fraud claims, and the jury's verdict was based on negligence, the Court concluded that this clause barred recovery.

We review *de novo* the District Court's grant of judgment as a matter of law under Federal Rule of Civil Procedure 50, using the same standard as the District Court. Cleveland v. Home Shopping Network, 369 F.3d 1189, 1192 (11th Cir. 2004). Judgment as a matter of law is appropriate "where there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Id. We must review all the evidence in the record and draw all reasonable inferences in favor of the nonmoving party. Id. "Credibility determinations, the

26

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. (*quoting* Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)).

Appellants argue on appeal that it was error for the District Court to uphold and apply the exculpatory clause because it violates public policy. "Contracts may be avoided by the courts as against public policy only in cases free from doubt and where the injury to the public is clear." Emory Univ. Porubiansky, 282 S.E.2d 903, 904-905 (Ga. 1981) (*citing* Phenix Ins. Co. v. Clay, 28 S.E. 853 (Ga. 1897)). However, Appellants point to no case in Georgia holding that an exculpatory clause in an engagement letter from an accounting firm is violative of public policy. Rather, they analogize to other types of professionals, such as medical or dental professionals, who courts have held may not shield themselves from liability with an exculpatory clause. See Porubiansky, 282 S.E.2d at 905; Olson v. Molzen, 558 S.W.2d 429, 430 (Tenn. 1977). Appellants argue that, like doctors and dentists, accountants must be licensed in Georgia, and that the state has a valid interest in assuring that licensed accountants comport with the standards of care established for the profession. Further, they argue that the separate common law duty owed by D&D to the Appellants, arising apart from its contractual obligations, is unique to licensed professionals and supports a conclusion that they

may not contract out of their obligation to exercise reasonable care.

However, this Court is not persuaded that the duties of an accountant are analogous to the duties of a medical or dental professional. In fact, courts within this Circuit have concluded that an exculpatory clause in a contract may be enforced, even where the contracting party, a securities broker, is a professional regulated by the state. Barton v. Peterson, 733 F. Supp. 1482, 1489 (N.D. Ga. 1990). In that case, the court emphasized that "the service is not one of practical necessity, nor are brokers generally willing to perform their services for any member of the public." Id. The court further reasoned that the parties were not of such unequal bargaining power to make the contract a contract of adhesion. Id. Likewise, in the instant case, Appellee D&D is a firm of financial professionals who provide accounting services to sophisticated clients with equal bargaining power. Unlike medical or dental services, accounting services are not a practical necessity. Furthermore, as D&D points out, there exists no state statute that specifies a duty of care for accountants, as there is for medical professionals. Given these distinct differences, we agree with the District Court that an exculpatory clause in a contract for the services of an accounting professional is enforceable.

Even if, as a general rule, exculpatory language eliminating the duty of care

for accountants was unenforceable as a matter of public policy, the particular exculpatory clause at issue in this case would still be enforceable. This is because the exculpatory language used by D&D in its engagement letter does not eliminate the duty of care, or preclude legal action against D&D entirely, it simply limits the type of damages that may be sought. The Porubiansky decision, in fact, explicitly left the door open to the possibility that even medical or dental professionals could limit liability in some ways, "agree[ing] that because the clinic is part of a teaching facility it may require that prospective patients waive the right to insist on complete treatment." 282 S.E.2d at 904. Thus, we agree with the District Court that the exculpatory language in D&D's engagement letter does not violate public policy and should be enforced. The District Court's entry of judgment as a matter of law in favor of Appellee D&D on the claims of professional negligence, ordinary and/or gross negligence, and breach of contract is affirmed.

## VI. Attorneys' Fees, Prejudgment Interest, and Correction of Final Judgment

Finally, Appellants appeal the District Court's denial of attorneys' fees incurred in proving that D&D was negligent in auditing the Burnt Store financials, denial of TSG's request for pre-judgment interest, and award of attorneys' fees and costs to Bencini. The decision whether or not to award attorneys' fees based

on D&D's refusal to stipulate is within the discretion of the District Court, and we find no abuse of discretion in this instance. Additionally, the issue of prejudgment interest is now moot in light of our affirmance of the District Court's entry of judgment as a matter of law in favor of D&D. Thus, these two orders of the District Court are affirmed. However, in light of our partial reversal of the order of summary judgment entered in favor of Bencini, we reverse the District Court's entry of Final Judgment in favor of Bencini for attorney's fees and costs, and remand the matter to the District Court for further proceedings.

## VII. Conclusion

For the foregoing reasons, the District Court's denial of the plaintiff's motion to remand this case to state court is AFFIRMED. The District Court's Order Granting Summary Judgment in favor of Bencini and D&D is VACATED in part as to the breach of fiduciary duty claim of all plaintiffs against Bencini, and the fraud and securities fraud claims of TSG and the inside investors against Bencini. These claims are REMANDED to the District Court for further proceedings consistent with this opinion. The District Court's Order granting judgment as a matter of law in favor of D&D on the claims of professional negligence, ordinary and/or gross negligence, and breach of contract is AFFIRMED. The District Court's Order denying the plaintiffs' request for

30

attorneys' fees and prejudgment interest is AFFIRMED.  The District Court's entry of final judgment in favor of Bencini for attorneys' fees and costs is VACATED and remanded to the District Court for further proceedings consistent with this opinion.